IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

MARCIA WILLIAMS,
12193 Montreat Place
Waldorf, MD 20601
(Charles County)

DAVID CIOTTI,
103 Murdock Road
Baltimore, MD 21212
(Baltimore City)

TOWANNA DAVISON,
7308 Foxbranch Court
Clinton, MD 20735
(Prince George's County)

MICHAEL GOETTING,
2312 Englewood Street
Kannapolis, NC 28083

TERRI EDGELL,
1421 South L Street
Elwood, Indiana 46036

JESSE WILSON,
207 2nd Street SW
Newfolden, Minnesota 56738

WHITNEY EVANS, and
1229 Halsey Avenue NE
Huntsville, AL 35801

JESSIE ESPINOZA,
3596 Descanso Avenue
Clovis, CA 93619

*on behalf of themselves and all individuals similarly
situated,*

                    Plaintiffs,

v.                                                Civil Action No. 8:25-cv-3489

FLAMAN MCCLOUD, JR.,
2726 Mission Rancheria Road
Lakeport, CA 95453

NICK JACK,
2726 Mission Rancheria Road
Lakeport, CA 95453

ALIYA PONCE,
2726 Mission Rancheria Road
Lakeport, CA 95453

VIVIAN MCCLOUD,
2726 Mission Rancheria Road
Lakeport, CA 95453

BEN RAY III, and
2726 Mission Rancheria Road
Lakeport, CA 95453

JOHN DOES 1-25,

                     Defendants.

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Marcia Williams, David Ciotti, Towanna Davison, Michael Goetting, Terri Edgell, Jesse Wilson, Whitney Evans, and Jessie Espinoza ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## <u>INTRODUCTION</u>

1.    This case arises from the making and collection of unlawful loans from online lending entities *purportedly* owned and operated by the Big Valley Band of Pomo Indians (the "Tribe"), a federally recognized Native American tribe. These loans impose triple-digit interest rates, exponentially higher than the interest rate cap permitted by laws in nearly every state.

2.      For example, Maryland law caps the interest rate on consumer loans issued to its residents, including Plaintiffs David Ciotti and Marcia Williams, at 33 percent. Md. Code, Com. § 12-306. Moreover, no person may make a loan under Maryland's Consumer Loan Law without a licensed issued by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Because the online entities in this case failed to obtain a license, they "may not receive or retain any principal, interest, or other compensation with respect to any loan[.]" Md. Code, Com. Law § 12-314.

3.      The loans are similarly illegal in the District of Columbia, North Carolina, Indiana, Minnesota, Alabama, and California, where Plaintiffs Davison, Goetting, Edgell, Wilson, Evans, and Espinoza resided when they obtained their loans.

4.       Seeking to ostensibly avoid state usury laws, Defendants established what is commonly referred to as a tribal lending business model—"the most recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).  Under this model, non-tribal payday lenders originate their loan products through a company "owned" by a Native American tribe and organized under its laws. The tribal company serves as a conduit for the loans, facilitating a dubious and legally incorrect claim that the loans are subject to tribal law, not the protections created by state usury and licensing laws. In exchange for the use of its name on the loan, the tribal company often receives only a small portion of the revenue and does not meaningfully participate in the day-to-day operations of the business.

5.      And regardless of the tribe's level of participation in the operations, however, the loans are illegal because it is well settled that "[a]bsent a federal law to the contrary, Indians going

3

beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). In other words, as recently explained by the Fourth Circuit, "substantive state law applies to off-reservation conduct," such as online loans marketed, collected, and paid by consumers in Virginia. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021). And "although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Id*.

6.    Despite the overwhelming authority regarding the illegality of these loan products, Defendants made, collected, and/or received interest from high-interest loans originated in the names of Layma d/b/a Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders (the "Tribal Lending Entities" or "TLEs")—four entities formed under tribal law to serve as the fronts to disguise the non-tribal payday lenders' role and to ostensibly shield the scheme by exploiting the Tribe's sovereign immunity.

7.    Upon information and belief, despite the ostensive connection to the Tribe, non-tribal members handle significant parts of the TLEs' operations and provide the capital used to make the entities' loans. In return, these non-tribal coconspirators receive the vast majority of the profits of the illegal lending enterprise.

8.    Defendants Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud members of the Big Valley Band of Pomo Indians Tribal Council. Although they may be motivated by their intention of advancing their own community, their effort to advance themselves exploits desperately poor people in other communities who, in their moment of despair, agree to take a small dollar loan with triple-digit interest rates. The Tribal Council members' consent,

authorization, and participation is a necessary component of the illegal lending enterprise and, thus, is instrumental in facilitating the creation of the illegal loans.

9.     In addition to the Tribal Council members, Defendant Ben Ray, III is the chief executive officer who manages all aspects of the Tribe's operations, including day-to-day management and oversight of the Tribe's involvement with the TLEs. Like the Tribal Council, Ben Ray's consent, authorization, and participation is a necessary component of the illegal lending enterprise and, thus, is instrumental in facilitating the creation of the illegal loans.

10.     Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452; *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990) (explaining that RICO "makes it unlawful for 'any person'—not just mobsters—to use money derived from [the unlawful collection of debt] to invest in an enterprise, to acquire control of an enterprise through [the unlawful collection of debt], or to conduct an enterprise through the [unlawful collection of debt].").

11.     Plaintiffs also assert a class claim for violations of state usury laws and unjust enrichment. Even though the loans were void as a matter of law in many states (and otherwise usurious in every other state except Utah and Nevada), Defendants nonetheless were involved in the making of the usurious loans and receipt of the usurious proceeds thereof. Accordingly, on behalf of themselves and other class members, Plaintiffs seek to disgorge all amounts paid on the void loans or in excess of a consumers' state interest rate, as well as other available statutory remedies and their attorneys' fees and costs.

12.     And Plaintiffs seek declaratory relief and injunctive relief against the named Defendants in their official capacities.

## JURISDICTION

13.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants have transacted their affairs in Maryland, including the making and collection of loans to likely thousands of residents in Maryland. Additionally, venue is also proper in this Court pursuant to 28 U.S.C. § 1965(b) because Plaintiffs Ciotti, Williams, and Towanna Davidson are residents of this District and Division and a substantial part of their claims occurred in Maryland.

## PARTIES

15.     Plaintiff David Ciotti ("Ciotti") is a natural person and resident of this Division and District.

16.     Plaintiff Marcia Williams ("Williams") is a natural person and resident of this District.

17.     Plaintiff Towanna Davison ("Davison") is a natural person and resident of this District.

18.     Plaintiff Michael Goetting ("Goetting") is a natural person and resident of North Carolina.

19.     Plaintiff Terri Edgell ("Edgell") is a natural person and resident of Indiana.

20.     Plaintiff Jesse Wilson ("Wilson") is a natural person and resident of Minnesota.

21.     Plaintiff Whitney Evans ("Evans") is a natural person and resident of Alabama.

22.    Plaintiff Jessie Espinoza ("Espinoza") is a natural person and resident of California.

23.    Defendant Flaman McCloud, Jr. ("McCloud, Jr.") is the Chairman of the Tribal Council of the Big Valley Band of Pomo Indians. As Chairman, Defendant McCloud, Jr.'s duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders.[1] In performing these duties, Defendant McCloud, Jr. meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seeks an injunction and declaratory relief against Chairman McCloud, Jr., in his official capacity, as well as damages from him in his individual capacity. *See Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 779 (W.D. Va. 2023) (explaining that sovereign immunity did not bar claims because "Plaintiffs seek damages for their RICO claims against the Tribal Council and Tribal Employee Defendants, in their individual capacities, based on loans issued online to them when they were located on non-tribal lands. They do not seek relief from the Tribal treasury, nor do they seek to interfere with the Tribe's self-governance or authority.").

24.    Defendant Nick Jack is the Vice Chairman of the Tribal Council of the Big Valley Band of Pomo Indians. As Vice Chairman, Defendant Jack's duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders. In performing these duties, Defendant Jack meets regularly with other members of the Tribal

---

[1] Although the tribal lending entities claim may be  entitled to immunity, the Supreme Court has held that "tribal immunity does not bar" a "suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seeks an injunction and declaratory relief against Vice Chairman Nick Jack in his official capacity, as well as damages from him in his individual capacity.

26. Defendant Aliya Ponce is the Treasurer of the Tribal Council of the Big Valley Band of Pomo Indians. As Treasurer, Defendant Ponce's duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders. In performing these duties, Defendant Ponce meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seeks an injunction and declaratory relief against Treasurer Ponce in her official capacity, as well as damages from her in her individual capacity.

26. Defendant Vivian McCloud is the Secretary of the Tribal Council of the Big Valley Band of Pomo Indians. As Secretary, Defendant McCloud's duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders. In performing these duties, Defendant McCloud meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on

the misconduct alleged herein, Plaintiffs seeks an injunction against Secretary McCloud in her official capacity, as well as damages from her in her individual capacity.

27.      Defendant Ben Ray, III is the chief executive officer of the Tribe.  As CEO, Defendant Ray's duties include the oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders. In performing these duties, Defendant Ray meets regularly with members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seeks an injunction against Defendant Ray in his official capacity, as well as damages from him in his individual capacity.

28.      Defendant John Doe Nos. 1-25 are unidentified parties who participated in the enterprise with the Defendants, including but not limited to entities who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

## FACTUAL BACKGROUND AND ALLEGATIONS

**A.      State usury and licensing laws protect consumers from usurious loans.**

29.      "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

30.      Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders.

### 1.    Maryland

31.    By way of example, Maryland law "caps the interest rate at 33% on all loans below $6,000." *CashCall, Inc. v. Maryland Com'r of Fin. Regul.*, 448 Md. 412, 418 (2016) (citing Md. Code, Com. Law §§ 12–306, 12–313, and 12–314).

32.    For more than a century, Maryland law has further required any person engaged "in the business of making loans" to be licensed or exempt from licensing. Md. Code, Com. Law § 12-302; *see also Nagle & Zaller, P.C. v. Delegall*, 480 Md. 274, 303 (2022) ("Maryland's licensing requirements for lenders of loans dates to a 1912 Act, which, among other things, required licensing of "petty loan brokers," capped certain fees depending on the amount borrowed, and mandated disclosure of the loan's terms to the borrower.").

33.    When Maryland's General Assembly replaced the original version of the statute in 1918, the "preamble to that law declared that: 'The conduct of [the business of making small loans] has long been the cause of general complaint, and of much hardship and injustice to borrowers, and there is no regulation or provisions of law which has proved effective for the protection of such borrowers and for the punishment of usurious money lenders ... and there is a real need for the enactment of a law that will enable [the] continuance [of small loan lending] under proper supervision[.]'" *Nagle & Zaller*, 480 Md. at 304 (quoting Ch. 88, 1918 Md. Laws 197, 197-198).

34.    In describing the purpose for the statute, the Court of Appeals of Maryland has noted that "[c]ountless instances illustrate the oppression and injustice wrought upon small needy borrowers by the callous and cruel greed so often found in the class engaged in the business of lending money in small amounts to those who have little to offer as security[.]" *Liberty Fin. Co., Inc. v. Catterton*, 161 Md. 650, 654, 158 A. 16 (1932).

35.     The court further added: "It was to mitigate rather than eradicate the evils incident to the business and to afford to the borrower the greatest practicable measure of protection that the act was passed." *Id*. at 18.

### 2.     District of Columbia

36.     Similarly, in the District of Columbia, where Davidson resided before moving to Maryland, parties cannot contract for the "payment of interest on the principal amount thereof at a rate not exceeding 24% per annum." D.C. Code Ann. § 28-3301.

### 3.     North Carolina

37.     Likewise, in North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

38.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

39.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

40.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

41.     Unlicensed lenders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor. N.C. Gen. Stat. § 53-166(c). Additionally, the entire loan becomes void,

and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

**4.      Indiana**

42.      Like other states, Indiana's lending and usury protections are a part of Indiana's clearly delineated public policy against usurious loans and predatory lending. Indeed, "Indiana's first usury statutes were passed before the turn of the 20th century . . . ." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009).

43.      In 2002, Indiana's legislature enacted the Indiana Small Loans Act to specifically respond to the growth of predatory payday lenders similar to the TLEs here. *Id.*

44.      As the Court of Appeals of Indiana has observed, some lenders believe that they may "ignore the historically moral and practical foundations for usury statutes and charge any amount of interest that the so-called payday loan 'free market' will bear." *Id.* at 1062.

45.      Such contracts, however, are unenforceable because of "public policy considerations." *Id.*

46.      Consistent with this, a usurious loan violates Indiana law if: (1) it is made without the license required by Indiana law; (2) it is made in excess of Indiana's interest rate caps for licensed lenders, which varies from 10% to 15% for loans of less than $550; *or* (3) it was made in excess of Indiana's general usury cap on consumer loans, which prohibits a finance charge in excess of 25%.

**5.      Minnesota**

47.      Similarly, Minnesota "sets its permissible rate of interest by statute, capping it at 8 percent annually." *Maslowski v. Prospect Funding Partners LLC*, 994 N.W.2d 293, 299 (Minn. 2023) (Minn. Stat. § 334.01).

6.      **Alabama**

48.     The maximum allowable interest on a loan made to Alabama consumers is 8%, if agreed upon in writing.  Ala. Code § 8-8-10.

49.     Alabama law proscribes the enforcement of loans with interest rates higher than 8% "except as to principal," meaning that no interest may be collected on the usurious loans.  Ala. Code § 8-8-12(a).  Any payments made above the principal amount are owed to the borrower.  *Id.* § 8-8-12(b).

7.      **California**

50.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872.  Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

51.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money."  *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

52.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

53.     "California state law currently limits the amount collected on a loan to "twelve dollars upon one hundred dollars for one year," or 12 percent.  Cal. Civ. Code § 1916-2.  "Any agreement or contract of any nature in conflict with [the interest rate cap] shall be null and void as

to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed." *Id.*

54.     Thus, "[a]n interest rate in excess of [12%] is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1164 (citing Cal. Civ. Code § 1916-2).

55.     California law further provides that any person who pays any amount exceeding the interest-rate cap may recover "treble the amount of the money so paid or value delivered in violation of said [cap]." Cal. Civ. Code § 1916-3(a).

56.     California has also deemed the willful lending of usurious loans without a license a felony "punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year." Cal. Civ. Code § 1916-3(b).

57.     In addition to abiding by California's usury cap, lenders issuing loans to California residents are also required to obtain a license under the California Financing Law. *See* Cal. Fin. Code §§ 22000*, et seq.*

58.     Even if licensed, moreover, a licensee is still limited in the interest rates it can charge based on the unpaid principal balance remaining. *See* Cal. Fin. Code § 22303 (setting, for example, a "two and one-half percent per month" rate maximum on "that part of the unpaid principal balance . . . up to, including, but not in excess of [$225]," while limiting the rate for the portion between $225 and $900 to 2 percent, and the rate for $900-$1,650 to 1.5 percent).

59.     Loans willfully issued by even unlicensed lenders in violation of these requirements are deemed "void" and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction."  Cal. Fin. Code § 22750.

60.     Those who willfully violate the licensing requirements are also subject to fines and imprisonment.  Cal. Fin. Code §§ 22753, 22780.

61.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'"  *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1166 (quoting *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

62.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices.  Cal. Bus. & Prof. Code § 17200

**8.     Other State Usury Laws.**

63.     Each state of residence of the putative class members also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[2]

---

[2] *See See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ariz. Rev. Stat. Ann. § 44-1201-1204; Ark. Const. Art. XIX § 13; Cal. Civ. Code §§ 1916-2, 1916-3; Cal. Fin. Code §§ 22750, 22753, 22780; Colo. Rev. Stat. §§ 5-2-201, 5-5-201; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.904, 516.02; O.C.G.A. §§ 7-3-1, et seq.; O.C.G.A. § 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009); Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.J. Code §§ 31:1-1, 31:1-3; N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1); S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

B.     **Overview of the Tribal Lending Model**

64.     Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

65.     Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[3] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

66.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

67.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

---

[3] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

68.     Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[4] Others, attempted to evade laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

69.     In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

70.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

71.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

72.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

73.     Often, at the other side of the table, were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on

---

[4] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* 17–22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origins of the tribal lending businesses).

74.     Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received a nominal amount of the proceeds from the loans.

75.     Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

76.     Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[5]

77.     In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these illegal loans and returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation

---

[5] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

and common fund of $37 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at

Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450

million in debt cancellation and a common fund of $39 million); *Turner v. ZestFinance, Inc.*, No.

3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of

a class settlement providing $170 million in debt cancellation and a common fund of $18.5

million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D.

Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt

cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final

Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement

providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV,*

*V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting

final approval of a class settlement providing $383 million in debt cancellation and a common

fund of $50 million).

78.    Two prominent perpetrators also were recently convicted and sentenced to prison

for their roles.[6]

79.    Despite all the litigation and enforcement efforts, Defendants knowingly aided,

abetted, facilitated, and profited from the usurious lending scheme as detailed below.

---

[6] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

C.    **The basic structure of the tribal lending model is designed to conceal the role of the non-tribal participants, such as John Does 1-25.**

80.    The tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

81.    This is accomplished primarily through a document dubiously labeled a "servicing agreement."

82.    By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

83.    Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.

84.    By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

85.    Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

86.    Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

87.    The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id*. § 3.5.1.

88.    As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶ 3.

89.    This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. ¶ 4.

90.    By way of another example, this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

91.    Pursuant to a "Services Agreement" between NPA and Silver Cloud one of Upper Lake's lending entities, NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 3 at 2264–65.

92.    Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

93.     Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 4 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

94.     The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

95.     A similar setup was used for the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 5.

96.     In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

97.     Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 6.

98.    According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

**D.    Defendants' tribal lending enterprise lends and collects money at rates that far exceed state usury laws.**

99.    In 2013, when the tribal lending model was emerging to replace the rent-a-bank model, the Tribe's Tribal Council enacted an ordinance establishing FreedomCashLenders.

100.    As early as July 3, 2013, consumers could obtain small-dollar loans from the website, www.freedomcashlenders.com, which is operated by FreedomCashLenders.

101.    According to its website, FreedomCashLenders is an "online payday lender" that consumers can "trust," with loan approval "within minutes."

102.    According to its "FAQ" webpage, FreedomCashLenders loans anywhere from $300 up to $1,500 depending on the consumer's income and other lending criteria. According to its own website, the annual percentage rate charged on these loans ranges from 600-780%.

103.    Similarly, in 2012, the Tribal Council enacted an ordinance establishing Tremont Lending, and consumers were able to obtain a loan from the website, www.tremontlending.com, starting on or around November 1, 2012.

104.    According to its website, Tremont Lending offers "cash advance loan[s] (payday loan[s])" for "unexpected car repairs," "emergency medical or dental issues," "child's prescriptions," or "unexpected needs requiring fast cash." In other words, when a borrower was desperate and financially vulnerable, it could get cash from Tremont Lending "overnight."

105.    Upon information and belief, Tremont Lending offers usurious loans on comparable terms to FreedomCashLenders, *i.e.*, loan amounts ranging from $300-$1,500 with annual percentage rates of 600-850%.

106.    Similarly, within the past seven years, the Tribal Council enacted an ordinance establishing Little Lake Lending.

107.    Upon information and belief, Little Lake Lending offers usurious loans on comparable terms to FreedomCashLenders and Tremont Lending, *i.e.*, loan amounts ranging from $300-$1,500 with annual percentage rates of 450-850%.

108.    And within the past few years, the Tribal Council has enacted an ordinance establishing Credit Cube, which, upon information and belief, also offers loans ranging from $300-$1,500 with annual percentage rates of 450-850%.

**E.    The Tribal Council's role in the enterprise.**

109.    RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added).

110.    The Supreme Court's decision in *Boyle v. United States* recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

111.    Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

112.    Here, Defendants are an association in fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans issued by the TLEs.

113.    The Big Valley Band of Pomo Indians is a Native American tribal government that has been federally recognized since its treaty with the United States in 1851.

114.    The Tribe's reservation is located on approximately 120 miles north of the city of San Francisco.

115.    The Tribe's Tribal Council serves as its governing body and has the power to make laws and ordinances pursuant to the Tribe's Constitution and laws.

116.    The Tribe's Tribal Council is vested with significant power, including the power to create tribal businesses and negotiate with third parties to assist with those businesses.

117.    Upon information and belief, the Tribal Council members have the authority to shut down the operations of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders, including ceasing the collection of unlawful amounts from Plaintiffs and the putative class members.

118.    Upon information and belief, Defendants Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud have been instrumental in facilitating the creation of the illegal lending business and each agreed to the collection of unlawful debt and conspired with the others herein to collect the unlawful debt from consumers.

119.    Upon information and belief, Defendants Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud have signed ordinances and participated in decisions with respect to the lending businesses—although it is likely that the vast majority of the day-to-day operations are outsourced to third parties who are not members of the Tribe.

120.    Upon information and belief, Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud have attended meetings related to the high-interest usurious loans offered by

Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders, and have voted in favor of their making and collection of the usurious loans.

121.    Defendant Ben Ray III has also been instrumental in the operation and management of the TLEs, overseeing and enacting the directives of the Tribal Council members, coordinating and carrying out the agreements of the Tribal Council members and the non-tribal coconspirators, and working to recruit additional nontribal investors and coconspirators interested in establishing tribal lending enterprises under the Tribe's name.

122.    Although the Tribe hold itself out as the actual lender of these internet loans, a substantial amount of the money comes from third party investors who enter into servicing and loan and security agreements with the Tribe, which must be approved by the Tribal Council.

123.    Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities.

124.    Through their participation in the lending enterprise, as well as their knowing facilitation of the scheme, Defendants have violated RICO.

**F.      Plaintiffs were charged excessive interest on their loans.**

125.    Defendants, together with others not yet known to Plaintiffs, marketed, initiated, and collected usurious loans throughout the country, including in Maryland, the District of Columbia, North Carolina, Indiana, Minnesota, Alabama, and California, as well as other states with similar usury protections.

126.    Defendants knew the loans were illegal under state usury and licensing laws, but they pursued the scheme anyway.

127.    They charged astronomical interest rates that far exceeded the rates allowed by applicable state laws.

128.    Upon information and belief, all of Defendants' loans to consumers used excessive interest rates far in excess of applicable state laws.

129.    Accordingly, the loans were and are null and void under applicable state law, and it is unlawful for Defendants, Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders, or any of their yet-to-be-identified non-tribal coconspirators to collect or receive any interest (or even principal in some states like Maryland) or other charges on said loans, including any amounts paid by Plaintiffs.

**1.      Plaintiff Ciotti**

130.    For example, Plaintiff David Ciotti received more than 20 loans from Little Lake and Credit Cube.

131.    Each of the loans issued to Plaintiff Ciotti imposed an interest rate ranging from 230% to 795%.

132.    As just one example, Plaintiff Ciotti entered into a loan agreement dated November 1, 2020, which imposed an interest rate of 795%.

133.    Plaintiff Ciotti repaid nearly all of these loans—resulting in more than ten thousand dollars in damages.

134.    For each loan, Plaintiff Ciotti used his Maryland address when applying for the loans, and he used his Maryland  bank account with a Maryland ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**2.    Plaintiff Williams**

135.    Similarly, on or around December 15, 2023, Plaintiff Marcia Williams applied for and received a $700 loan from Little Lake Lending.

136.    This loan imposed an interest rate of 695%, requiring repayment of more than $3,800 over approximately 8 months.

137.     Plaintiff Williams has repaid at least $1,287.12 on the loan—all of which was void and uncollectible under Maryland law.

138.    Plaintiff Williams used her Maryland address on her loan application, and she used her Maryland bank account with a Maryland ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**3.    Plaintiff Davison**

139.    On or around March 3, 2024, Plaintiff Towanna Davison applied for and received a $300 loan from Little Lake Lending.

140.    This loan imposed an interest rate of 795%, requiring repayment of more than $1,550 over approximately 8 months.

141.    Plaintiff Davison has repaid at least $1,214 on her loan.

142.    Plaintiff Davison used her District of Columbia address on her loan application, and she used her District of Columbia bank account with a District of Columbia ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**4.    Plaintiff Goetting**

143.    Plaintiff Goetting received at least 4 loans from Little Lake and Credit Cube.

144.    The loans issued to Plaintiff Goetting imposed an interest rates of 324% and 649%.

145.    For example, Plaintiff Goetting entered into a loan agreement dated January 13, 2023, which imposed an interest rate of 649%.

146.    Plaintiff Goetting repaid thousands of dollars on his loans—all of which was void and uncollectible under North Carolina law.

147.    For each loan, Plaintiff Goetting used his North Carolina address on his loan application, and he used his North Carolina bank account with a North Carolina ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**5.    Plaintiff Edgell**

148.    On or around December 15, 2023, Plaintiff Terri Edgell applied for and received a $500 loan from Little Lake Lending.

149.    This loan imposed an interest rate of 795%, requiring repayment of more than $2,768 in approximately 8 months.

150.    Plaintiff Edgell used her Indiana address on her loan application, and she used her Indiana bank account with an Indiana ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

**6.    Plaintiff Wilson**

151.    Similarly, Plaintiff Wilson received 2 loans from Little Lake.

152.    The loans issued to Plaintiff Wilson imposed interest rates of 426%.

153.    Plaintiff Wilson repaid thousands of dollars on his loans—all of which was void and uncollectible under Minnesota law.

154.    For each loan, Plaintiff Wilson used his Minnesota address when applying for the loans, and he used his Minnesota bank account with a Minnesota ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**7.    Plaintiff Evans**

155.    Between 2021 and 2023, Plaintiff Evans received five loans from Little Lake. Plaintiff Evans also received three loans from Green Arrow between 2023 and 2024.

156.    The loans issued to Plaintiff Evans imposed interest rates of at least 419% and as high as 786.91%.

157.    Plaintiff Evans repaid thousands of dollars on her loans, including more than she borrowed, in violation fo Alabama law.

158.    For each loan, Plaintiff Evans used her Alabama address when applying for the loans, and she used her Alabama bank account with a Alabama ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**8.    Plaintiff Espinoza**

159.    In January 2025, Plaintiff Espinoza received a loan from Little Lake for $1,200, with an interest rate of 550%.  In April 2025, Plaintiff Espinoza also received a loan from Credit Cube for $461.73, with an interest rate of 553.22%.  And in February 2025, Mr. Espionoza received a loan from Green Arrow with a 817.41% interest rate.  Mr. Espinoza also has a loan from FreedomCash with a similar triple-digit interest rate.

160.    Plaintiff Esiponza has repaid more than he borrowed on these loans.

161.    For each loan, Plaintiff Espinoza used his California address when applying for the loans, and he used his California bank account with a California ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

162.    As outlined above, he loans issued to Plaintiffs violated the respective usury statutes of each of their home states and entitle Plaintiffs to the remedies provided under those states' laws, including avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.

163.    Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here.[7]

---

[7] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest

164.     Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM: ALL PLAINTIFFS AGAINST ALL DEFENDANTS
## IN THEIR INDIVIDUAL CAPACITIES ONLY)

165.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

166.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in Maryland, the District of Columbia, North Carolina, Indiana, Minnesota, Alabama, California, or any other state other than Utah or Nevada.

167.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

168.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

---

or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether Defendants conducted or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against each Defendant.

169.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

170.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

171.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such

individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

172.    **Injunctive Relief Appropriate for the Class.**  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein, including a prohibition on collections from consumers and/or the sale of the loans to third parties; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

173.    All of the loans made to consumers in Maryland, the District of Columbia, North Carolina, Indiana, Minnesota, Alabama, and California, and to other consumers throughout the United States (except Utah and Nevada), included an interest rate far in excess of twice the enforceable rate in the consumers' respective state.

174.    As alleged above, Defendants associated with an enterprise that existed for the purpose of collection of unlawful debt, agreed that the enterprise would engage in the collection of unlawful debt, and participated in the affairs of the enterprise.

175.    Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

176.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise which would not have been made but for Defendants' conduct.

177.    Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (CLASS CLAIM: ALL PLAINTIFFS AGAINST ALL DEFENDANTS
### IN THEIR INDIVIDUAL CAPACITIES ONLY)

178.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

179.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in Maryland, the District of Columbia, North Carolina, Indiana, Minnesota, Alabama, California, or any other state other than Utah or Nevada.

180.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

181.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions

predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether there was a conspiracy to collect unlawful debt; (3) at what point each defendant joined the conspiracy; (4) whether the loans are "unlawful debt" for purposes of RICO; and (5) what is the proper recovery for Plaintiffs and the class members against each Defendant.

182.    **Typicality**. **Fed. R. Civ. P. 23(a)(3)**. Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

183.    **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

184.    **Injunctive Relief Appropriate for the Class**.  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the enterprise; and ordering the dissolution of each Defendant that has engaged in the enterprise.

185.    As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(b)-(c), including but not limited to: (1) various loan and security agreements with third party investors; (2) agreements related to the purchasing of shares with respect to the unlawful loans; and (3) authorization of the usurious loan agreements entered into with Plaintiffs and other class members.

186.    Defendants conspired and agreed to advance a RICO undertaking and caused Plaintiffs to repay amounts on unlawful loans.

187.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

### COUNT THREE:
### VIOLATIONS OF LICENSING AND USURY LAWS
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

188.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

189.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in Maryland, the District of Columbia, North Carolina, Indiana, Minnesota, Alabama, California, or any other state other than Utah or Nevada.

190.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Ciotti and Williams bring this action on behalf of themselves and the following subclass—the "Maryland Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in Maryland.

191.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Davison bring this action on behalf of himself and the following subclass—the "District of Columbia Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in the District of Columbia.

192.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Goetting brings this action on behalf of himself and the following subclass—the "North Carolina Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in North Carolina.

193.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Edgell brings this action on behalf of himself and the following subclass—the "Indiana Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in Indiana.

194.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Wilson brings this action on behalf of himself and the following subclass—the "Minnesota Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in Minnesota.

195.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Evans brings this action on behalf of herself and the following subclass—the "Alabama Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in Alabama.

196.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Espinoza brings this action on behalf of himself and the following subclass—the "California Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) while located in California.

197.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

198.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

199.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

200.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).**

Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate

over the questions affecting only individual class members. The principal issues include: (1)

whether Defendants obtained a license to lend in any state; (2) whether Defendants' loans violate

state licensing requirements, such as the state of Maryland; (3) whether Defendants' loans violate

state usury laws because the interest levels were too high; (4) what is the proper recovery for

Plaintiffs and the class members against each of the Defendants.

201.    **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the

class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively

redress the wrongs done to them. Even if the members of the class themselves could afford such

individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized

litigation presents a potential for inconsistent or contradictory judgments and increases the delay

and expense to all parties and to the court system because of the legal and factual issues raised by

Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a

single set of proof in a case.

202.    Maryland, North Carolina, Indiana and many other states require all who engage in

the business of making personal loans to be licensed.

203.    None of the Defendants were licensed to make loans in Maryland, North Carolina, Indiana or any other state in the United States.

204.    Because Defendants failed to obtain a license and charged excessive interest rates, the loans are null and void in Maryland, North Carolina, Indiana, as well as many other states. Accordingly, Plaintiffs and class members may disgorge the amounts received by Defendants.

205.    In addition to licensing violations, Defendants' loans violated the general usury laws of many states, including Alabama, California, and Minnesota, as well as the District of Columbia. As a result, Plaintiffs and class members are entitled to recover the applicable damages allowed by those jurisdictions' respective usury statutes.

## COUNT FOUR:
### Declaratory Judgment Under 28 U.S.C. § 2201
### (CLASS CLAIM AGAINST THE TRIBAL COUNCIL
### DEFENDANTS IN THEIR OFFICIAL CAPACITIES ONLY)

206.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

207.    Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

208.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, North Carolina, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

209.    Maryland, North Carolina, Indiana, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode

Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

210.    Little   Lake   Lending,   Credit   Cube,   Green   Arrow   Solutions,   and FreedomCashLenders were not licensed to make loans in Maryland, North Carolina, Indiana, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

211.    Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

212.    Plaintiffs and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

213.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

214.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

215.    Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are invalid and the loans are uncollectable. Plaintiffs also seek to enjoin the Tribal Council, in their official capacity, from allowing collection on the loans.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment for themselves and the classes and subclasses they seek to represent against Defendants, including for:

A.    Certification of this matter to proceed as a class action;

B.    Declaratory, injunctive, and compensatory relief as pled herein;

C.    Attorney's fees, litigation expenses, and costs of suit; and

D.    Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:_____/s/ Kristi C. Kelly_____
Kristi C. Kelly, Esq., Md. Bar # 1406060003
Andrew J. Guzzo, Esq., *pro hace vice forthcoming*
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com